Frank S. Hedin (SBN 291289)
fhedin@hedinhall.com
David W. Hall (SBN 274921)
dhall@hedinhall.com
HEDIN HALL LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

*Counsel for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNE ABE, individually and on behalf of all others similarly situated, | Case No.  8:19-cv-00699-JVS-ADS |
| Plaintiff, | FIRST AMENDED CLASS ACTION COMPLAINT[1] |
| v. | (JURY TRIAL DEMANDED) |
| HYUNDAI MOTOR AMERICA, INC., | |
| Defendant. | |

Plaintiff June Abe, individually and on behalf of all others similarly situated, complains and alleges as follows based on personal knowledge as to herself, on the investigation of her counsel, and on information and belief as to all other matters. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth in this complaint, after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.     Plaintiff brings this action for legal and equitable remedies resulting from the illegal actions of Hyundai Motor America, Inc. in transmitting unsolicited,

---

[1]     Plaintiff files this First Amended Class Action Complaint with the written consent of Defendant. *See* Fed. R. Civ. P. 15(a)(2).

autodialed SMS or MMS text messages, *en masse*, to Plaintiff's cellular device and the cellular devices of numerous other individuals across the country, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

## JURISDICTION AND VENUE

2.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227.

3.     Personal jurisdiction and venue are proper in this district because Defendant maintains its corporate headquarters in this district, because Plaintiff resides in this district, and because the claims alleged in this action arose in substantial part in this district.

## PARTIES

4.     Plaintiff is an individual and a "person" as defined by 47 U.S.C. § 153(39). Plaintiff is, and at all times mentioned herein was, a citizen and resident of Irvine, California.

5.     Defendant Hyundai Motor America, Inc. is a "person" as defined by 47 U.S.C. § 153(39).  Defendant maintains, and at all times mentioned herein maintained, its corporate headquarters in Fountain Valley, California.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991

6.     To address consumer complaints regarding certain telemarketing practices, Congress enacted the TCPA, 47 U.S.C. § 227, in 1991.  The TCPA prohibits, inter alia, the use of automated telephone equipment, or "autodialers," to make any call, including sending a text message, to a wireless number absent an emergency or the "prior express consent" of the party called.  And in the case of calls or text messages

FIRST AMENDED CLASS ACTION COMPLAINT

1    that constitute "advertisements" or "telemarketing", as defined by applicable

2    regulations, the TCPA requires the "prior express written consent" of the called party

3    before initiating such calls or texts using an autodialer or prerecorded voice.

4         7.    According to findings by the Federal Communication Commission

5    ("FCC"), which is vested with authority to issue regulations implementing the TCPA,

6    autodialed calls and texts are prohibited because receiving them is a greater nuisance

7    and more invasive than live solicitation calls and they can be costly and inconvenient.

8    The FCC also recognized that wireless customers are charged for such incoming calls

9    and texts whether they pay in advance or after the minutes or texts are used.

10        8.    One of the most prevalent bulk advertising methods employed by

11   companies today involves the use of "Short Message Services" (or "SMS"), which is a

12   system that allows for the transmission and receipt of short text messages to and from

13   wireless telephones.  Another similar service called "Multimedia Messaging Services"

14   (or "MMS") is based upon and similar to the SMS system, but also permits the

15   transmission of photos and videos via text message.  According to a recent study,

16   "[s]pam isn't just for email anymore; it comes in the form of unwanted text messages

17   of all kinds — from coupons to phishing schemes — sent directly to user's cell

18   phones."[2]

19        9.    SMS and MMS text messages are directed to a wireless device through a

20   telephone number assigned to the device. When an SMS or MMS text message is

21   successfully transmitted, the recipient's wireless phone alerts the recipient that a

22

23   [2]    Cell Phones and American Adults: They Make Just as Many Calls, but Text Less
     than Teens, Pew Research, http://www.pewinternet.org/Reports/2010/Cell-Phones-
24   and-American-Adults.aspx.

FIRST AMENDED CLASS ACTION COMPLAINT

1   message has been received.   SMS and MMS text messages are received virtually

2   anywhere in the world.

3       10.    Unlike more conventional advertisements, SMS and MMS message

4   advertisements can actually cost their recipients money because wireless phone users

5   must pay their wireless service providers either for each text message they receive or

6   incur a usage allocation deduction to their text messaging or data plan, regardless of

7   whether the message is authorized.

8       11.    Moreover, the transmission of an unsolicited SMS or MMS text message

9   to a cellular device is distracting and aggravating to the recipient and intrudes upon the

10   recipient's seclusion.

11         **<u>FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS</u>**

12       12.    Plaintiff is, and at all times mentioned herein was, the subscriber of the

13   cellular telephone number (949) ***-3021 (the "3021 Number").  The 3021 Number

14   is, and at all times mentioned herein was, assigned to a cellular telephone service as

15   specified in 47 U.S.C. § 227(b)(1)(A)(iii).

16       13.    At all times relevant to this action, Defendant has operated, maintained,

17   overseen, and controlled all aspects of, and has funded and reaped enormous financial

18   benefits from, the "Hyundai National Test Drive Offer" promotional program.  The

19   "Hyundai National Test Drive Offer" program affords consumers the opportunity to

20   test drive one of Defendant's vehicles, at any of its hundreds of dealerships nationwide,

21   and to receive a "rewards card," typically in the range of $25 to $50, for doing so.

22   Defendant created and continues to fund, operate, maintain, and oversee all aspects of

23   the "Hyundai National Test Drive Offer" program because the program assists

24

- 4 -

FIRST AMENDED CLASS ACTION COMPLAINT

Defendant's various dealerships identify new sales leads, obtain valuable personal information from those leads, aggressively market to those leads, and ultimately put themselves in a better position to sell Defendant's vehicles – essentially, the lifeblood of Defendant's company, from which Defendant derives substantial financial benefit. *See* "Hyundai National Test Drive Program," AutoHook, LLC, attached hereto as Exhibit A (describing program and Defendant's implementation, oversight, and control over dealerships' involvement in program and associated marketing practices).

14.     In connection with the "Hyundai National Test Drive Offer," Defendant contracted with a company called AutoHook, LLC to provide Defendant and all of its participating dealerships nationwide, including the Garden Grove Dealership in Garden Grove, California, access to a "sales attribution engine to drive the highest intent-to-buy customers straight into dealer showrooms," which is "proven to increase incremental sales, new to brand buyers, showroom visits, and lift conversion rates across channels." *See* "What Is AutoHook?," AutoHook, LLC, *available at* https://www.driveautohook.com/hyundai, at 1 (last accessed July 15, 2019), a true and correct copy of which is attached hereto as Exhibit B.  Defendant partners and contracts with Autohook on behalf of all of Defendant's dealerships nationwide, including the Garden Grove Dealership in Garden Grove, California, pursuant to an arrangement under which Autohook  provides Defendant's participating dealerships access to a comprehensive, cutting-edge marketing suite – including a lead generation platform, direct digital marketing CRM, and "post-lead pilot" program – that was all "established by Hyundai Motor America." *See* "AutoHook – Post Lead Opt-In," AutoHook, LLC, https://ui.driveautohook.com/UI/PartnerOnBoardingForm/HyundaiPostLead         (last

- 5 -

FIRST AMENDED CLASS ACTION COMPLAINT

1    accessed July 15, 2019), a true and correct copy of which is attached hererto as <u>Exhibit</u>

2    <u>C</u>.

3        15.    Defendant contracted with AutoHook for and offers all of its dealerships

4    access to the a "post-lead" solution platform in connection with its Hyundai-Sponsored

5    AutoHook program. (*See* <u>Exhibit D</u> hereto, at 4.) This "post-lead solution," the

6    acquisition and implementation of which was provided, overseen, and controlled by

7    Defendant, enables Defendant's dealerships to "maximize their incoming leads from

8    their other sources" and "automatically score[] their existing leads to identify and target

9    the highest intent-to-buy customers with a test drive incentive via email" and other

10   marketing channels, including text message. *See id.*  As explained by one Hyundai

11   dealership that uses this solution to lure leads back to its showrooms:

12           This product allows us to send customized links through our
             marketing outreach to incent potential customers to come see
13           what we have to offer. It gives individuals that extra nudge
             when they may be hesitant or coming from a distance! We
14           are able to strategically target leads that we receive making
             AutoHook a beneficial tool and the success we have received
15           from the customization options in AutoHook+ are truly
             preferred.
16
17   (*Id.* at 7.)

18       16.    Defendant's Hyundai-Sponsored AutoHook program is also integrated

19   with a platform from Urban Science called MarketMaster, which is described as

20   providing all Hyundai-participating dealerships with the following technology

21   integrated into the AutoHook platform:

22           SEIZE EVERY CONVERSION OPPORTUNITY.
             AutoHook, powered by Urban Science is proud to announce
23           the integration of their conversion solutions into
             MarketMaster for Hyundai. Within the MarketMaster
24           dashboard, dealers and OEMs can locate and quantify missed

- 6 -

FIRST AMENDED CLASS ACTION COMPLAINT

opportunities and lost sales revenue. The integration is designed to increase showroom visits and drive conversion of customers, many of which are new to the Hyundai brand.

HOW IT WORKS:
An AutoHook consultant will work with the dealership to analyze and target their lowest performing metrics to drive market share growth. The dealer's AutoHook solutions will be programed with specific parameters to target missed opportunities in areas with low conversion rates.

Exhibit E hereto, at 1; *see also* Exhibit F, at 1-2 (Urban Science website stating: "To close more sales, marketers need to generate qualified traffic. Our advanced targeting starts by applying near-real-time buyer suppression to produce audience segments that specifically address campaign objectives. Once we find the right audience, we activate highly targeted, private offers to drive the highest intent-to-buy customers straight to Dealer showrooms. And our timely reporting definitively links these marketing activities to sales, traffic and defection data allowing in-flight campaign optimization based on what's working."). Defendant maintains, controls, and oversees the integration of MarketMaster into the Hyundai-Sponsored AutoHook program. MarketMaster enables all of Hyundai's dealerships, including without limitation the Garden Grove dealership in Garden Grove, California, to transmit SMS and MMS text messages to leads in connection with the "Hyundai National Test Drive Offer" on Defendant's behalf, for the purpose of selling vehicles to such leads and generating commercial profit for Defendant in the process.

17. Additionally, Defendant's Hyundai-Sponsored AutoHook program is integrated with an "AI-driven" platform from a company called Outsell, which is used by Defendant, with its dealerships, AutoHook, and Outsell acting as its agents, "to auto-generate individualized customer incentives," sent via text message, e-mail and other

FIRST AMENDED CLASS ACTION COMPLAINT

digital channels, in order "to drive in-store dealership visits" by customers who were previously targeted by Defendant in connection with its "Hyundai National Test Drive Offer" promotional program.   The Outsell technology integrated into Defendant's Hyundai-Sponsored AutoHook program is described as follows:

> AutoHook powered by Urban Science, the automotive industry's proven leader in driving incremental showroom traffic to dealerships, today announced their official integration with Outsell, the premier AI-driven marketing automation platform that empowers automotive dealerships and OEMs to create lasting customer relationships driving incremental sales and profits.
>
> As part of AutoHook's open API program, Outsell has united AutoHook's exclusive incentive redemption system directly into its AI-driven marketing automation platform, allowing Outsell to auto-generate individualized customer incentives proven to drive in-store dealership visits and sales. "The integration between AutoHook and Outsell's AI-driven platform allows dealers to quickly realize ROI with a sales incentive solution that gives consumers a reason to visit a local dealership for a test drive, said Litded Davis, Outsell's Vice President of Product and Program Management. "AutoHook's robust API communicates with our system to generate individualized incentive offers and near real-time reports on performance."
> . . .
> "The value of an open API system allows two vendors to communicate and work as one, establishing a stronger network of actionable data that ultimately benefits dealers," said David Metter, President of AutoHook powered by Urban Science. "Outsell is an ideal API ally as together we will provide car shoppers with a more personal experience that we know converts leads into physical and incremental showroom visits."
> Outsell's proprietary use of artificial intelligence determines the best offer for each individual allowing dealers to focus their incentive budget on the right consumers. Higher-value test drive offers are served to likely defectors to incentivize them to visit a particular dealer's showroom for a test drive.

- 8 -

FIRST AMENDED CLASS ACTION COMPLAINT

*See* Exhibit G hereto (news release on Urban Science's website concerning Outsell integrations).

18.     Using the above-described AutoHook platform and its related technological integrations, Defendant oversees, maintains, controls, and derives substantial benefits from all aspects of the "Hyundai National Test Drive Offer" promotional program, including the transmission of text messages to its customers and prospective customers, sent via its various dealerships, representatives from AutoHook, Urban Science, and Outsell, and other third-party intermediaries acting as its agents. *See, e.g.,* Exhibit H hereto (describing AutoHook's texting capabilities utilized by Defendant, directly and indirectly via its participating dealerships).

19.     On AutoHook's webpage describing its "Hyundai-Sponsored Solutions," three of Defendant's participating dealerships provide testimonials concerning such solutions and the benefits that they (and by extension, Defendant) derive from them:

> "Since beginning with AutoHook, our third party lead conversion rate has increased dramatically. Our website conversions have also increased using their web overlay incentives. We've been very happy with the level of support we get from the team, and we're looking forward to continuing our relationship and seeing more great enhancements come down the pipeline."
>
> *Andrew DiFeo*
> *Pres. of Hyundai Dealer Advisory Board, Gen. Mgr.*
> *Hyundai of St. Augustine*
>
> "The AutoHook Test Drive Program has helped our store generate more traffic more into our dealership. In the last 3 months of the year we can attribute a 37% raise in showroom traffic to the AutoHook Solution. Using the AutoHook portal we can identify our incoming leads, and use it in our outreach to our customers. The easy 30 second redemption process lets us form a great relationship with our customers."

FIRST AMENDED CLASS ACTION COMPLAINT

*Jason Pies*
*General Manager*
*Capital Hyundai*

"We've been using the AutoHook program for over two years, <u>and it continues to help us drive in-market customers into our showroom. I include the test drive offers in all my outreach to potential customers to bring them in to see my team</u>. We close our Internet leads at a 70-80% rate and AutoHook certainly contributes to those numbers. <u>The gift card brings them to us, and our team's customer service converts them into buyers</u>. For those dealers who don't use the AutoHook solutions to their fullest, you are missing out big time!"

*Carlos Lopez*
*Internet Manager*
*Cocoa Hyundai*

Ex. B at 2-3 (emphasis added).

20.     Defendant's "Hyundai National Test Drive Offer" program, powered by AutoHook's technology and integrated with Urban Science's MarketMaster platform and Outsell's AI technology, is thus part of a massive marketing scheme designed by Defendant to help its army of dealerships acquire personal information from prospective buyers, aggressively market to those "leads," and ultimately sell its cars to those leads – for the purpose of generating a substantial, continuous stream of new revenue and otherwise enhancing the formidability of its brand.  The gist of the scheme goes like this:

Gift-card offers encouraging test drives are common. A quick search reveals opportunities from Ford, Honda, Kia, Toyota, and Volvo, to name a few. <u>Many of the offers are from the manufacturers,</u> others are from the dealers themselves. And you don't always have to do much to cash in. Heck, in Maryland, a test drive can't legally be required. But to get a card, you'll have to let the dealership put your name into its marketing system.

- 10 -

"Why Hyundai is Paying Customers \$50 to Take a Test Drive," Car and Driver, *available at* https://www.caranddriver.com/features/a25423117/hyundai-dealerships-pay-to-test-drive-deal/ (last accessed July 15, 2019), at 2 (emphasis added), a copy of which is attached hereto as Exhibit I.

21.    In this case, it was Defendant who directly issued offers to Plaintiff and the other members of the proposed Class, pursuant to a centralized marketing program that it created, developed, and funded, and which it presently maintains and oversees, on behalf of its various dealerships. And upon acquiring customers and prospective customers' personal information, Defendant then, either directly or through its army of dealerships armed with AutoHook's technology and the related integrations from Urban Science and Outsell, moves them "through the funnel" and into its showrooms by way of targeted digital marketing, including text-message marketing:

> Dean Evans, Hyundai Motor America's chief marketing officer, says the gift-card offer has driven about 175,000 people to Hyundai dealerships. "We have been doing the program now nationally for about a year and a half. [It has] sold 76,000 cars. And we've had 500,000 people fill out the forms on in-market websites."
> . . .
> Hyundai, however, isn't about to back away from the program. "If you're spending \$4500 or some high-level number to get the customer into the showroom," Evans continues, "and then you're putting in \$4000 to \$5000 a car on incentives, our logic is simple. Why would you not pay \$50 to keep people moving through the funnel? Consumers are only going to an average of 1.5 dealers before they buy."
> If the gift-card offer makes Hyundai a shopper's first stop, it's well worth the money.

Ex. H at 2.

22.    For instance, or about December 25, 2018, in response to an advertisement that Defendant had directed to Plaintiff online, Plaintiff visited Defendant's website

FIRST AMENDED CLASS ACTION COMPLAINT

HyundaiUSA.com to register for a test drive of one of Defendant's vehicles, and to receive a coupon redeemable for a $50 "reward card" in connection with Defendant's "Hyundai National Test Drive Offer" program for doing so.   At Defendant's HyundaiUSA.com website that Plaintiff visited on or about December 25, 2018, Plaintiff navigated to the same or substantially the same webpage as is shown in the screenshot below:



23.     Upon clicking a hyperlink on the above-depicted webpage on Defendant's HyundaiUSA.com website to register for a test drive and receive a $50 reward card, Plaintiff was presented with a pop-up screen on Defendant's website that was the same or substantially the same as the screen shown below:

FIRST AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13



14      24.    Although the pop-up screen shown in the screenshot in paragraph 23

15  above states that "all fields [are] required," only the "first name," "last name," "e-mail,"

16  "ZIP," and "Select Model" fields must actually be completed in order to submit the

17  form.

18      25.    Thus, if a visitor does not input a ZIP code in the "ZIP" form field, the

19  page displays the "ZIP field in red to indicate that it must be completed in order to

20  submit the form:

21

22

23

24

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13   26.    However, the "Phone" field need not be completed, and the checkbox

14   alongside the fine-print disclosure statement at the bottom of the screen need not be

15   checked, in order to submit the form. Thus, once the "first name," "last name," "e-

16   mail," "ZIP" and "Select Model" fields on the form are completed, the form may be

17   submitted by pressing the blue "Get Your Code" button, as shown in the following

18   screenshot:

19
20
21
22
23
24

FIRST AMENDED CLASS ACTION COMPLAINT

27.     Upon pressing the blue "Get Your Code" button at the bottom of the above-depicted screen – even without having inputted a "phone" number or checked the box alongside the disclosure statement at the bottom – the visitor would receive a digital "coupon" containing a uniquely-identifying "code," in the form shown below:

FIRST AMENDED CLASS ACTION COMPLAINT

28.     The coupon depicted above could thereafter be printed by the visitor and brought to any Hyundai dealership to redeem for a test drive and a $50 reward card.

29.     The screenshots in paragraphs 23-27 above depict webpages that appear to visitors in pop-up boxes after hyperlinks pertaining to Defendant's "Hyundai National Test Drive Offer" are clicked on Defendant's HyundaiUSA.com website(s). The webpages that load in such pop-up boxes are located on web servers accessible via the domain name incentivesnetwork.net, which is owned, operated, and/or maintained by Defendant. The webpages depicted in the screenshots in paragraphs 23-27 above are the same or substantially the same, in both content and appearance, as the webpages

FIRST AMENDED CLASS ACTION COMPLAINT

1   that would have appeared to visitors of those webpages at all times relevant to this

2   action, including to Plaintiff on or about December 25, 2018.

3          30.   The screenshots in paragraphs 23-27 above depict the same or

4   substantially the same screens that appeared on the webpages that Plaintiff navigated

5   through via the HyundaiUSA.com website, and the information reflected on the

6   webpage shown in the screenshot in paragraph 27 is the same type of information that

7   Plaintiff inputted into the form depicted in paragraph 26 above prior to pressing the

8   blue "Get Your Code" button.

9          31.   Specifically, on or about December 25, 2018, Plaintiff inputted

10  information into certain of the fields on the form shown in the screenshots in paragraphs

11  23-26; specifically, Plaintiff inputted her first name, last name, e-mail address, and ZIP

12  code into the form, and selected a vehicle model from the "Select Model" pulldown

13  field on the form; critically, however, <u>Plaintiff did not input her phone number in the</u>

14  <u>"phone" field on the form and Plaintiff did not check the checkbox alongside the</u>

15  <u>disclosure statement at the bottom of the form</u>.

16         32.   Thus, upon pressing the "Get Your Code" button at the bottom of the form

17  accessible on Defendant's website depicted in paragraphs 23-26, Plaintiff was directed

18  to a webpage that contained the following printable coupon (except without any of the

19  handwritten information that appears on the version shown below):

20

21

22

23

24

- 17 -
FIRST AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20



21   33.   As shown in the screenshot above, the only information pertaining to

22   Plaintiff that appears on the printable coupon to which Plaintiff was directed on or

23   about December 25, 2018 (after submitting the form depicted in the screenshots in

24

FIRST AMENDED CLASS ACTION COMPLAINT

1   paragraphs 23-26 above) is her first and last name, e-mail address, and ZIP code.  And

2   because Plaintiff refrained from inputting her phone number into the "phone" field on

3   the form (and refrained from checking the box alongside the disclosure statement at the

4   bottom of the form), Plaintiff's phone number did not appear on the coupon that she

5   received from Defendant upon submitting the form on Defendant's website.

6       34.    The printable coupon that appeared when Plaintiff submitted the form on

7   Defendant's  "Hyundai National Test Drive Offer" webpage, shown in the screenshot

8   in paragraph 32 above, was issued to Plaintiff by Defendant, either directly or indirectly

9   through one of its dealership(s) or agent(s) acting as an intermediary or as

10  intermediaries, pursuant to an overall marketing campaign that was initiated, operated,

11  maintained, and overseen by Defendant. On its face, the coupon Plaintiff received

12  states that it was issued by "Hyundai Motor America" via "HyundaiUSA.com," and

13  that it may be "present[ed] . . . at Any Participating Hyundai Dealer to receive your

14  FREE $50 Visa Prepaid Card!"  (*See supra* ¶ 32.)  Additionally, on the bottom half of

15  the coupon, Defendant provides "Dealer Redemption Instructions," which are to be

16  followed by whichever dealership Plaintiff chooses to redeem the coupon at – clearly

17  indicating that Defendant maintains control and oversight over all aspects of its

18  "Hyundai National Test Drive Offer" program, including such minutia as the manner

19  in which coupons are to be redeemed by Defendant's many participating dealers across

20  the country.

21      35.    The fine print at the bottom of the coupon states, in pertinent part:

22          Coupon can be redeemed at any participating Hyundai
            Dealer. . . . Hyundai Dealership employees and people
23          covered under an employee purchase plan and their family
            members are not eligible.  Participating Hyundai Dealers and

24

- 19 -

FIRST AMENDED CLASS ACTION COMPLAINT

> their affiliated companies are not liable for any loss, damages, or delay to any person or property in connection with the use of this coupon. . . .

*Id.* This fine print makes clear that Defendant implemented its "Hyundai National Test Drive Offer" promotional program on a "national" basis, such that the test drive and rewards card redemption coupons generated on its website are redeemable at any of Defendant's hundreds of dealerships nationwide.   This fine print also reflects that Defendant both controls its dealerships' participation in this promotional program ("Hyundai Dealership employees and people covered under an employee purchase plan and their family members are not eligible."), as well as shields its dealerships from liability they might otherwise incur in connection with the program, including damages "in connection with the use of th[e] coupon[s]." *See id.* ("Participating Hyundai Dealers and their affiliated companies are not liable for any loss, damages, or delay to any person or property in connection with the use of this coupon.").

36.     In or around early January 2019, armed with the coupon she had obtained from Defendant on its website depicted in paragraph 32 above, Plaintiff frequented the Russell Westbrook Hyundai of Garden Grove car dealership (the "Garden Grove Dealership") – one of Defendant's franchisee dealerships located in Garden Grove, California – to test drive one of Defendant's automobiles available for purchase there.

37.     Shortly after visiting the Garden Grove Dealership, and despite the fact that Plaintiff had not consented to receive Defendant's automated telemarketing text messages (by declining to check the box on Defendant's web-based form on or about December 25, 2018), Defendant nonetheless transmitted or caused to be transmitted, by itself or through an intermediary or intermediaries, including without limitation one

- 20 -

FIRST AMENDED CLASS ACTION COMPLAINT

1  or more of its agent(s) at the Garden Grove Dealership, multiple SMS or MMS text

2  messages to the 3021 Number without Plaintiff's prior express written consent.

3      38.   The first SMS or MMS text message that Defendant sent to Plaintiff's

4  3021 Number via the AutoHook platform, integrated with Outsell's AI-driven

5  technology, and/or similar such automated technology provided by Urban Science,

6  contained advertising and telemarketing material, was sent for the commercial purpose

7  of selling goods to Plaintiff in the future, and included the instructions "Reply YES to

8  confirm, or reply STOP at anytime to end."   At the time the message was sent,

9  Defendant clearly knew that Plaintiff had not checked the box to express her consent

10  to receive automated marketing or advertising messages from Defendant or its

11  dealerships.  Although this first message itself did not reference the term "autodialer,"

12  "autodialed," or "automated," the inclusion of these automated instructions was clear

13  indicia of Defendant's use of an "automatic telephone dialing system" in the

14  transmission of the message.

15      39.   By way of another example, the final text message that Defendant sent to

16  Plaintiff via the AutoHook platform, integrated with Outsell's AI-driven technology

17  (and/or similar such automated technology) so as to make the message appear as though

18  it was sent from a real human being, is depicted in the screenshot below, which was

19  extracted from Plaintiff's cellular device:

20

21

22

23

24

- 21 -

FIRST AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11



12    40.    The source of Defendant's unsolicited text messages transmitted to the

13  3021 Number was (714) 577-2046, which is a telephone number leased by Defendant

14  or Defendant's agent(s) or affiliate(s) and is used for operating Defendant's text

15  message marketing program.

16    41.    Because Plaintiff is alerted by her cellular device, by auditory or visual

17  means, whenever she receives a text message, the unsolicited text messages that

18  Defendant transmitted to Plaintiff's cellular device were invasive and intruded upon

19  Plaintiff's seclusion upon receipt. Plaintiff became distracted and aggravated as a result

20  of receiving Defendant's unsolicited text messages.

21    42.    As explained in detail above, Defendant uniformly directed, encouraged,

22  and authorized its franchisee dealerships, including without limitation the Garden

23  Grove Dealership, to send text messages promoting the sale of Defendant's goods and

24

FIRST AMENDED CLASS ACTION COMPLAINT

1   services to prospective customers, including to Plaintiff and other members of the

2   proposed Class. Defendant uniformly directed, encouraged, and authorized its

3   franchisee dealerships, including without limitation the Garden Grove Dealership, to

4   send such text messages pursuant to a common marketing scheme that, at all times

5   relevant to this action, was overseen, maintained, and controlled by Defendant.

6   43.   In fact, the web-based form that Plaintiff submitted on Defendant's

7   website pertaining to Defendant's  "Hyundai National Test Drive Offer" program, as

8   depicted in paragraphs 23-26 above, states as follows in the disclosure statement

9   alongside an empty checkbox:

10

11
┌──────────────────────────────────────────────────────────────┐
│  ☐   I consent to receiving telemarketing calls or texts at this number using an  │
│      automatic telephone dialing system by, or on behalf of, Hyundai and its      │
12  │      authorized dealers. I understand I do not have to consent in order to         │
│      purchase any products or services. Carrier charges may apply.                 │
13  └──────────────────────────────────────────────────────────────┘

14   44.   The disclosure statement and checkbox shown in paragraph 43 above have

15   appeared at the bottom of the form on Defendant's "Hyundai National Test Drive

16   Offer" webpage, as shown in the screenshots in paragraphs 23-26 above, at all times

17   relevant to this action, including on or about December 25, 2018.

18   45.   Thus, Defendant had admitted, on its own website, in connection with its

19   "Hyundai National Test Drive Offer" program, including on or about December 25,

20   2018, that text messages will be sent to individuals who check the box "by, or on behalf

21   of, Hyundai [i.e., Defendant] and its authorized dealers." *See id.* (emphasis added).

22   46.   Moreover, Defendant also admits in the disclosure statement depicted in

23   the screenshot in paragraph 43 above that it transmitted, either directly or indirectly by

24

- 23 -

FIRST AMENDED CLASS ACTION COMPLAINT

1  way of its agent(s) or affiliate(s), including without limitation its franchisee dealerships

2  such as the Garden Grove Dealership, the offending text messages to Plaintiff and the

3  other unnamed proposed Class members via an "automatic telephone dialing system."

4  *See id.*

5      47.    Indeed, Defendant or Defendant's agent(s) or affiliate(s), including

6  without limitation the Garden Grove Dealership and its employees, transmitted the

7  offending text messages to the 3021 Number and the numbers of the members of the

8  Class defined below using an "automated telephone dialing system" as defined by 47

9  U.S.C. § 227(b)(1)(A) because its text messages were sent from a telephone number

10  used to message consumers *en masse*; because the messages contained pro forma

11  instructional commands for confirming or opting-out of further messages, thus

12  indicating the use of an autodialer; because the dialing equipment used to send such

13  messages includes features substantially similar to a predictive dialer, inasmuch as such

14  equipment is capable of making numerous calls or texts simultaneously (all without

15  human intervention); and because the hardware and software used by Defendant or

16  Defendant's agent(s) or affiliate(s), including without limitation the Garden Grove

17  Dealership, to send such messages have the capacity to store, produce, and dial random

18  or sequential numbers, or to receive and store lists of telephone numbers and to then

19  dial such numbers, *en masse*, in an automated fashion and without human

20  intervention.

21      48.    And in fact, Defendant or Defendant's agent(s) or affiliate(s), including

22  without limitation the Garden Grove Dealership, actually transmitted the text messages

23  at issue in this case on Defendant's behalf to Plaintiff and all other unnamed Class

24

- 24 -

FIRST AMENDED CLASS ACTION COMPLAINT

1    members in an automated fashion and without human intervention, with hardware and

2    software that received and stored lists of telephone numbers to be dialed and then dialed

3    such numbers automatically.[3]

4        49.   The complained of SMS and/or MMS text messages sent by Defendant or

5    Defendant's agent(s) or affiliate(s), including without limitation the Garden Grove

6    Dealership, on Defendant's behalf to the 3021 Number and to the numbers of the

7    members of the Class defined below constituted "advertisements" and/or

8    "telemarketing" material within the meaning of the applicable TCPA regulations.  This

9    is because Defendant or Defendant's agent(s) or affiliate(s), including without

10   limitation the Garden Grove Dealership, sent the messages in order to advertise and

11   market Defendant's goods and services, for the purpose of ultimately selling such

12   goods and services to Plaintiff and other Class members for commercial profit.

13       50.   Neither Plaintiff nor any members of the proposed Class provided their

14   "prior express written consent" to Defendant or any of Defendant's agent(s) or

15   affiliate(s), including without limitation the Garden Grove Dealership, to permit

16   Defendant or any such agent(s) or affiliate(s) to transmit text messages to the 3021

17   Number or to any of the Class's telephone numbers using an "automatic telephone

18   dialing system" within the meaning of 47 U.S.C. § 227(b)(1)(A).

19

20

21

---

[3]   Additionally, to the extent powered by Outsell's and/or Urban Science's AI-driven technology integrated into AutoHook, such hardware and software also acted and operated as a "predictive dialer" in transmitting the offending text messages to Plaintiff and the members of the Class.

FIRST AMENDED CLASS ACTION COMPLAINT

## **CLASS ALLEGATIONS**

51.     Class Definition. Plaintiff brings this civil class action on behalf of herself individually and on behalf of all other similarly situated persons as a class action pursuant to Federal Rule of Civil Procedure 23. The "Class" which Plaintiff seeks to represent is comprised of and defined as follows:

> All persons within the United States to whom, between April 15, 2015 and the present, Defendant or an affiliate, subsidiary, or agent of Defendant (including without limitation any of its dealerships and/or AutoHook, Urban Science, or Outsell) delivered one or more text message(s) promoting Defendant's goods or services pursuant to a common marketing campaign maintained by Defendant or by an affiliate, subsidiary, or agent of Defendant on Defendant's behalf, without having obtained such person's prior express written consent to be sent such text message(s).

52.     Defendant, its employees, and agents (including its franchisee dealerships and their employees) are excluded from the Class.

53.     Plaintiff reserves the right to modify the definition of the Class (or add one or more subclasses) after further discovery.

54.     Plaintiff and all Class members have been impacted and harmed by the acts of Defendant or its affiliates or subsidiaries.

55.     This Class Action Complaint seeks injunctive relief and monetary damages.

56.     This action may properly be brought and maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b). This class action satisfies the numerosity, typicality, adequacy, commonality, predominance, and superiority requirements.

FIRST AMENDED CLASS ACTION COMPLAINT

57.     Upon application by Plaintiff's counsel for certification of the Class, the Court may also be requested to utilize and certify subclasses in the interests of manageability, justice, or judicial economy.

58.     Numerosity. The number of persons within the Class is substantial, believed to amount to thousands of persons dispersed throughout the United States. It is, therefore, impractical to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.

59.     Typicality. Plaintiff was sent at least one text message from Defendant without providing her "prior express written consent" to be sent such message(s) from Defendant within the meaning of the TCPA. Consequently, the claims of Plaintiff are typical of the claims of the members of the Class, and Plaintiff's interests are consistent with and not antagonistic to those of the other Class members she seeks to represent. Plaintiff and all members of the Class have been impacted by, and face continuing harm arising out of, Defendant's violations or misconduct as alleged herein.

60.     Adequacy. As Class representative, Plaintiff has no interests adverse to, or which conflict with, the interests of the absent members of the Class, and is able to fairly and adequately represent and protect the interests of such a Class. Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiff may seek

1  leave to amend this Class Action Complaint to add additional Class representatives or

2  assert additional claims.

3      61.   <u>Competency of Class Counsel</u>. Plaintiff has retained and is represented by

4  experienced, qualified, and competent counsel committed to prosecuting this action.

5  Plaintiff's counsel are experienced in handling complex class action claims, in

6  particular claims brought under the TCPA and other consumer protection statutes.

7      62.   <u>Commonality and Predominance</u>. There are well-defined common

8  questions of fact and law that exist as to all members of the Class and predominate over

9  any questions affecting only individual members of the Class. These common legal and

10  factual questions, which do not vary from Class member to Class member and may be

11  determined without reference to the individual circumstances of any Class member,

12  include (but are not limited to) the following:

13          a)  Whether Defendant or affiliates, subsidiaries, or agents of

14              Defendant transmitted advertising or telemarketing text

15              messages to Plaintiff's and Class members' cellular

16              telephones;

17          b)  Whether such text messages were sent using an "automatic

18              telephone dialing system";

19          c)  Whether Defendant or affiliates, subsidiaries, or agents of

20              Defendant can meet their burden to show Defendant obtained

21              "prior express written consent" (as defined by 47 C.F.R.

22              64.1200(f)(8)) to send the text messages complained of,

23              assuming such an affirmative defense is raised;

24

- 28 -

FIRST AMENDED CLASS ACTION COMPLAINT

d) Whether Defendant or affiliates, subsidiaries, or agents of Defendant should be enjoined from engaging in such conduct in the future.

63. <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is impracticable. Even if every member of the Class could afford to pursue individual litigation, the Court system could not. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system by causing multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action. Class wide relief is essential to compel compliance with the TCPA. The interest of Class members in individually controlling the prosecution of separate claims is small because the statutory damages in an individual action for violation of the TCPA are small. Management of these claims is likely to present significantly fewer difficulties than are presented in many class actions because the text messages at issue are all automated and the Class members, by definition, did not provide the prior express written consent required under the statute to authorize such text messages to their cellular telephones.  The Class members can be readily located and notified of this class

FIRST AMENDED CLASS ACTION COMPLAINT

1  action through Defendant's records and, if necessary, the records of cellular telephone

2  providers.

3      64.    Additionally, the prosecution of separate actions by individual Class

4  members would create a risk of multiple adjudications with respect to them that would,

5  as a practical matter, be dispositive of the interests of other members of the Class who

6  are not parties to such adjudications, thereby substantially impairing or impeding the

7  ability of such nonparty Class members to protect their interests. The prosecution of

8  individual actions by Class members could further establish inconsistent results and/or

9  establish incompatible standards of conduct for Defendant.

10     65.    Defendant or any affiliates, subsidiaries, or agents of Defendant have

11  acted on grounds generally applicable to the Class, thereby making final injunctive

12  relief and corresponding declaratory relief with respect to the Class as a whole

13  appropriate. Moreover, on information and belief, Plaintiff alleges that the TCPA

14  violations complained of herein are substantially likely to continue in the future if an

15  injunction is not entered.

16                          **CLAIM FOR RELIEF**
                    VIOLATION OF THE TELEPHONE
17                  CONSUMER PROTECTION ACT
                        (47 U.S.C. § 227)
18
19     66.    Plaintiff incorporates by reference the foregoing paragraphs of this Class

20  Action Complaint as if fully stated herein.

21     67.    The foregoing acts and omissions constitute violations of the TCPA by

22  Defendant, including but not limited to violations of 47 U.S.C. § 227(b)(1).

23

24
                              - 30 -

68.     As a result of Defendant's violations of the TCPA, Plaintiff and all Class members are entitled to, and do seek, injunctive relief prohibiting such conduct violating the TCPA in the future pursuant to 47 U.S.C. § 227(b)(3).

69.     As a result of Defendant's violations of the TCPA, Plaintiff and all Class members are also entitled to, and do seek, an award of $500.00 in statutory damages for each violation of the TCPA (or $1,500.00 for any such violations committed willfully or knowingly) pursuant to 47 U.S.C. § 227(b)(3).

70.     Plaintiff and Class members also seek an award of attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff June Abe prays for relief and judgment in favor of herself and the Class as follows:

A.     Injunctive relief prohibiting such violations of the TCPA in the future;

B.     As a result of each of Defendant's violations of 47 U.S.C. § 227(b)(1), Plaintiff seeks for herself and each class member statutory damages of $500.00 (or $1,500.00 for any violations committed willfully or knowingly);

C.     An award of attorneys' fees and costs to counsel for Plaintiff and the Class; and

D.     An Order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class and any Subclasses the Court deems appropriate, finding that Plaintiff is a proper representative of the Class, and appointing the law firms representing Plaintiff as counsel for the Class.

FIRST AMENDED CLASS ACTION COMPLAINT

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of herself and the Class, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims so triable.

Dated: July 15, 2019

Respectfully submitted,

**HEDIN HALL LLP**

By: <u>/s/ Frank S. Hedin</u>
        Frank S. Hedin

FRANK S. HEDIN (SBN 291289)
fhedin@hedinhall.com
DAVID W. HALL (SBN 274921)
dhall@hedinhall.com
Four Embarcadero Center, Suite 1400
San Francisco, California 94111
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

*Counsel for Plaintiff and Putative Class*

- 32 -

FIRST AMENDED CLASS ACTION COMPLAINT